# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**RONDA DOLIN,**                                    Case No. 1:19 CV 2097

      Plaintiff,

      v.                                        Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Ronda Dolin ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons stated below, the Court affirms.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in October 2016 and May 2017, respectively, alleging a disability onset date of February 25, 2016. (Tr. 183-86). Her claims were denied initially and upon reconsideration. (Tr. 91, 126). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 142). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 1, 2018. (Tr. 40-77). On September 13, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-34). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3);

*see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on September 12, 2019. (Doc. 1).

FACTUAL BACKGROUND

Personal Background and Testimony

Born in 1978, Plaintiff was 37 years old on her alleged onset date. *See* Tr. 32, 183. Plaintiff left school in the ninth grade and attended special education classes for the entirety of her academic career; she never completed a GED. (Tr. 58).

Plaintiff previously worked for eight years as a production weigher (Tr. 54, 71), but had not worked in about two years at the time of the August 2018 hearing (Tr. 71). She left her job because the required lifting caused increasing levels of back pain that radiated into her right leg and arm. (Tr. 55). The job was "light on paperwork"; there was always another person to help her read what she did not understand. (Tr. 66). Plaintiff has Erb's palsy in her right extremity, causing weakness and pain. (Tr. 54, 286). Because of this palsy, other employees helped Plaintiff with heavy lifting. (Tr. 54).

Plaintiff completed most tasks with her left hand, as the Erb's palsy prevented use of the right. (Tr. 60). She described a tremor in her right hand that caused her to drop things (Tr. 66-67), numbness and tingling in both hands (Tr. 59), and pain in her left shoulder due to a recent fall (Tr. 60). Plaintiff had fallen four times within the three months prior to the hearing because of dizzy spells. (Tr. 61). Her pain level without medication was about seven out of ten; with steroid injections and pain medication, it was about four out of ten. (Tr. 68).

Plaintiff described anxiety in public that caused shaking and sweating. (Tr. 63). She did not like to go anywhere alone. *Id.* She slept very little because she did not feel safe. (Tr. 65). Plaintiff was on a new anxiety medication but she did not think it was working. (Tr. 63).

2

Plaintiff lived alone with her dog. (Tr. 48). Her mother and sister helped with household chores, such as laundry and yard work. (Tr. 49). Plaintiff could not carry her laundry. (Tr. 50). Plaintiff testified she prepared simple – typically microwaveable – meals for herself. *Id.* She could shower and dress herself, but with difficulty. *Id.*

Plaintiff could drive but did not have a vehicle. (Tr. 51). She went to the grocery store with her mother, where she pushed a cart for support. *Id.* She occasionally went out for coffee with a friend. (Tr. 53). She did not use a computer and used a cell phone only for phone calls. (Tr. 52).

Relevant Physical Medical Evidence

Records from Plaintiff's early childhood document ongoing right arm and shoulder symptoms. *See* Tr. 284, 286, 287, 299.

In February 2016, Plaintiff saw Abraham Pedro, M.D. (Tr. 304). She described numbness and weakness in her right arm and leg, severe headaches, eight months of neck pain with radiation to her right arm and leg, decreased physical activity, dizziness, and loss of balance. (Tr. 304-05). Plaintiff complained of a gait disturbance, muscle weakness, and pain in her lower back. (Tr. 306). Dr. Pedro documented a normal gait and no joint abnormalities. *Id.* He diagnosed paresthesia of right upper and lower extremities, facial paresthesia, weakness of right upper and lower extremities, and acute intractable headache (Tr. 309) and noted prior diagnoses of Erb's palsy and asthma (Tr. 305). Dr. Pedro continued Plaintiff's medications (including Xanax, Mobic, Nasalcrom, Zanaflex, Proair HFA, Proventil, and a nebulizer). (Tr. 309). That same month, Dr. Pedro ordered a cervical spine MRI, which showed mild degenerative changes at C5 and C6 and a left paracentral protrusion of the C5-6 disc. (Tr. 296-97).

In November 2016, Plaintiff returned to Dr. Pedro and complained of low back pain, worsening numbness on the right side of her face, and swelling and numbness in her right leg. (Tr.

390). Dr. Pedro noted no abnormalities other than dermatitis but diagnosed facial paresthesia, Erb's palsy, cervical radiculopathy, anserine bursitis, and lumbar radiculopathy. (Tr. 393). At a follow-up two weeks later (Tr. 3151), Dr. Pedro noted a rash Plaintiff complained of on both forearms, but no other abnormalities. (Tr. 354). He referred Plaintiff to neurologist Darshan Mahajan, M.D., for her Erb's palsy, paresthesia, and right upper extremity weakness. (Tr. 355).

In December 2016, Plaintiff saw Dr. Mahajan, who noted mild scoliosis of the thoracolumbar spine, restricted right arm movement, slightly decreased muscle mass in the right hand, mild weakness in the right upper extremity, shoulder abductors, biceps, and triceps, decreased deep tendon flexion in the right upper extremity, normal coordination and normal gait, decreased temperature and pinprick sensation below the knees and elbows, and decreased vibratory sensation in the distal extremities and on the right side of the forehead. (Tr. 440). Dr. Mahajan diagnosed Erb's paralysis, hereditary motor and sensory neuropathy, low back pain, idiopathic scoliosis, and essential tremor. (Tr. 441). He noted the Erb's palsy seemed mild. (Tr. 444). He recommended physical therapy for Plaintiff's neck and back, ordered lab work for the peripheral neuropathy, and increased Plaintiff's prescription for Tizanidine to three times daily. (Tr. 442).

Plaintiff followed up with Dr. Pedro in January 2017, reporting continued, but somewhat lessened, shoulder, neck, and back pain radiating to her right upper extremity. (Tr. 372-73). Dr. Pedro documented no abnormalities, but diagnosed chronic bilateral low back pain. (Tr. 376). A few days later, a physical therapist documented an abnormal range of motion in Plaintiff's lumbar and cervical spine, decreased functional mobility, decreased strength and coordination, and limitations due to pain. (Tr. 455-56).

Physician Kyle Walker examined Plaintiff in February 2017. (Tr. 467-70). Plaintiff complained of pain in her back and right arm; her back pain improved with medication, and

4

physical therapy had provided mild to moderate relief. (Tr. 467). Plaintiff attested she could sit for 30 minutes, walk for 30 minutes, and stand for 15 to 20 minutes. *Id.* Dr. Walker diagnosed Erb's palsy and chronic low back pain. (Tr. 469).

In March, Dr. Pedro noted Plaintiff had good results in physical therapy. (Tr. 419). In May, Plaintiff complained to Dr. Pedro of rheumatoid arthritis, but stated arthritis medications and a TENS unit helped her symptoms. (Tr. 412). Plaintiff complained of joint pain, joint stiffness, and low back pain. (Tr. 415). Dr. Pedro noted no abnormalities on examination and made encounter diagnoses of vertigo, Erb's palsy, chronic neck pain, facial paresthesia, chronic bilateral low back pain, and chronic migraine. (Tr. 415-16). He recommended muscle strengthening exercises, use of the TENS unit, ice and heat, analgesics, muscle relaxants, and avoidance of heavy lifting. (Tr. 417).

In June 2017, Plaintiff saw Charles Choi, M.D., to whom Dr. Pedro had referred her, for pain management. (Tr. 709). Plaintiff had been in physical therapy for two months without much improvement, and NSAIDs provided minimal relief. *Id.* Dr. Choi noted a decreased range of motion, decreased strength, and a deformity in Plaintiff's right shoulder. (Tr. 712). He also noted a decreased range of motion, pain, and tenderness in Plaintiff's lumbar back, but no radiculopathy. *Id.* An X-ray showed distal lumbar and SI joint arthritis and a probable chronic L5 spondylosis. (Tr. 717). Dr. Choi diagnosed chronic mechanical low back pain from facet arthrosis. (Tr. 709). Later that month, Plaintiff returned to Dr. Choi and complained of low back pain radiating down her right leg; Dr. Choi observed a decreased range of motion, tenderness, and pain. (Tr. 703, 706). Plaintiff subsequently underwent bilateral facet joint injections at L3-4, L4-5, and L5-S1, reporting 80 percent pain relief fifteen minutes afterward. (Tr. 701).

Later that month, Plaintiff returned to Dr. Pedro for lower back pain. (Tr. 541). Dr. Pedro observed no abnormalities on examination, but noted diagnoses of chronic bilateral low back pain, chronic migraine, mild intermittent asthma, and polyarthritis. (Tr. 545).

In July, Plaintiff saw Mark Bej, M.D., who observed a full range of motion in Plaintiff's neck, abnormal tandem gait, a severe spasm in the cervical spine, a moderate spasm in the thoracic and lumbar spines, very tender greater occipital nerves, and decreased motor function and reflexes in the upper right extremity. (Tr. 530)[1]. He diagnosed migraine, cervical paraspinal muscle spasm, bilateral occipital neuralgia, and ataxic gait. (Tr. 528). He prescribed medication and bilateral occipital nerve injections. *Id.* In late August, Dr. Bej noted the same diagnoses. (Tr. 585). At an appointment with Dr. Pedro in September, Plaintiff stated her migraines improved on Topamax, but her lower back pain persisted. (Tr. 598). Dr. Pedro advised low back exercises. (Tr. 604-05).

In November, Dr. Bej noted the same problems as in Plaintiff's first visit, an ongoing spinal spasm, and reduced right arm reflexes. (Tr. 580, 582). Physical therapy notes from later that month show limited but improved range of motion, strength, reaching, and lifting. (Tr. 578). In December, Plaintiff told her physical therapist she felt less stiff, her neck had loosened somewhat, and her pain and headaches were less frequent, though her range of motion, strength, and ability to reach were still limited and painful. (Tr. 576). Plaintiff was discharged from physical therapy, with a final report of mild improvement and given a home exercise plan. (Tr. 577-78).

In January 2018, Plaintiff complained to Dr. Pedro of chronic back pain and headaches. (Tr. 655). In February, Plaintiff saw Dr. Bej, who again diagnosed migraine, cervical paraspinal muscle spasm, bilateral occipital neuralgia, and ataxic gait; he prescribed magnesium. (Tr. 573).

---

1. Elsewhere in this same treatment record, Dr. Bej noted "[s]tation and gait are normal . . . [t]oe, heel, and tandem walking are performed without difficulty." (Tr. 531).

Strength and reflexes in Plaintiff's right arm remained weakened; Dr. Bej described the spasm in Plaintiff's cervical and lumbar spine as moderate and mild in the thoracic spine. (Tr. 575).

In April, Plaintiff saw Kimberly Fish, C.P.A., at Dr. Bej's office. (Tr. 570). Ms. Fish noted the spasm throughout Plaintiff's spine was mild to moderate; Plaintiff had tenderness in the greater occipital nerve and decreased reflexes and motor abilities in the right arm. (Tr. 572).

That same month, Dr. Pedro referred Plaintiff to an orthopedic surgeon for her left shoulder. (Tr. 667). Plaintiff went to the Center for Orthopedics reporting a fall two months previous, a subsequent injury to her left shoulder, and a history of Erb's palsy and lower back pain. (Tr. 557). The physician noted minor pain in Plaintiff's left shoulder, biceps, and lateral deltoid; pain was more notable with impingement. (Tr. 558). She had a normal gait. (Tr. 558). On the right side, Plaintiff had Erb's palsy at C5 and "a little bit of strength" at C6-7. *Id.* The physician diagnosed rotator cuff tendinitis with impingement and rotator cuff contusion; he prescribed medication, alternating heat and ice, and shoulder exercises. *Id.* Notes from this visit were faxed to Dr. Pedro. (Tr. 669).

Plaintiff saw Ms. Fish again in May and described two recent falls, feeling "off balance," a tremor in her lower jaw, and slightly worsened pain and weakness in her right forearm. (Tr. 566). On examination, Ms. Fish noted no change in right arm strength, range of movement, or reflexes; the spasm in Plaintiff's spine remained mild to moderate. (Tr. 567). She diagnosed migraine, tremor, cervical paraspinal muscle spasm, neck trigger point, ataxic gait, Erb's palsy, and bilateral occipital neuralgia; she adjusted medications and recommended increased home exercises. (Tr. 568). She also made a note to check for authorization for trigger point injections to Plaintiff's neck, to schedule them when authorized, and to consider a referral to a brachial plexus specialist for Erb's palsy. *Id.*

An electroneuromyelogram by Dr. Bej in July showed carpal tunnel syndrome in Plaintiff's left wrist and a mild chronic axonal neuropathy in Plaintiff's right brachial plexus. (Tr. 740). Dr. Bej recommended braces for carpal tunnel, and injections if the braces were not sufficient. *Id.*

Physical Opinion Evidence

In February 2017, Dr. Walker opined Plaintiff "is likely to have significant limitations with lifting, carrying, handling objects, and overhead activities when the [right upper extremity] is required. These limitations are secondary to what is likely an Erb's palsy, a chronic condition that is unlikely to significantly improve over time." *Id.* He further opined Plaintiff did not have any limitations in sitting, walking, standing, hearing, speaking, traveling, or with memory. *Id.*

State agency physician Edmond Gardner, M.D., reviewed Plaintiff's records and provided a physical residual functional capacity assessment in March 2017. (Tr. 88). He opined Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk for a total of six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday. (Tr. 86). Plaintiff's capacity to push and pull was limited in the right upper extremity. *Id.* Dr. Gardner opined Plaintiff could occasionally climb ramps or stairs, crouch, kneel, crawl, balance, or stoop, but never use ladders or scaffolds. (Tr. 86-87). Plaintiff could occasionally reach, handle, finger, or feel with her right hand; she could never lift overhead with her right arm. (Tr. 87). Dr. Gardner recommended Plaintiff avoid all exposure to hazards and never work at unprotected heights or around unprotected moving machinery. (Tr. 88).

State agency physician David Knierim, M.D., reviewed Plaintiff's records and provided a physical residual functional capacity assessment in June 2017; his findings were identical to those of Dr. Gardner. (Tr. 102-04).

Dr. Pedro provided an assessment of Plaintiff's physical capacity in April 2018. (Tr. 549-50). He opined Plaintiff could occasionally carry 15 pounds and rarely carry 10 (due to Erb's palsy); stand and walk for a total of two hours in an eight-hour workday (due to severe spondylosis and peripheral neuropathy); sit for a total of two hours in an eight-hour workday (due to lower back pain and lumbar spondylosis); rarely climb, balance, stoop, crouch, and crawl, and occasionally kneel (due to peripheral neuropathy, chronic low back pain, and ataxic gait). (Tr. 549). He opined Plaintiff could rarely reach, pull, push, or perform fine manipulation, but occasionally perform gross manipulation (due to Erb's palsy). (Tr. 550). He recommended restrictions on heights, moving machinery, temperature extremes, pulmonary irritants, and noise. *Id.* He opined Plaintiff's moderate pain would interfere with concentration, take her off task, and cause absenteeism; she needed to alternate sitting, standing, and walking throughout the day, elevate her legs at will, and required four hours of rest during a workday in addition to normal breaks. *Id.* Dr. Pedro cited Plaintiff's impaired mobility and ataxic gait for these opinions. *Id.*

On May 18, 2018, Ms. Fish provided an assessment of Plaintiff's physical capacity. (Tr. 565). She opined Plaintiff could occasionally lift five pounds and frequently lift two pounds (due to Erb's palsy); stand and walk for 30 to 60 minutes without interruption; and rarely climb, balance, stoop, kneel, or crawl, but occasionally crouch (due to back spasm). (Tr. 564). Plaintiff's ability to sit was not limited. *Id.* Ms. Fish opined Plaintiff could rarely reach, push, pull, or perform fine or gross manipulation with her right hand (due to Erb's palsy), but could occasionally do all of these tasks with her left hand. (Tr. 565). Ms. Fish recommended restrictions on heights, moving machinery, temperature extremes, pulmonary irritants, and noise. *Id.* She further opined Plaintiff would need to alternate sitting, standing, and walking, elevate her legs at an angle of 90 degrees at will while sitting, and take two unscheduled fifteen-minute breaks. *Id.* Ms. Fish further stated

Plaintiff experienced mild to moderate pain that would take her off task, interfere with concentration, and cause absenteeism. *Id.*

Relevant Mental Medical Evidence

Dr. Pedro diagnosed mild mental retardation when Plaintiff saw him in February 2016. (Tr. 309). At that time, Plaintiff denied any problems with anxiety, depression, or concentration. (Tr. 306). Nine months later, Dr. Pedro diagnosed Plaintiff with generalized anxiety disorder. (Tr. 351). Dr. Mahajan repeated this diagnosis (Tr. 441) and recommended Plaintiff see a psychiatrist (Tr. 443). In November 2016, Dr. Pedro noted Plaintiff denied problems with anxiety, depression, or concentration. (Tr. 393).

In late December 2016, Plaintiff saw counselor Alison Campbell, LPCC, at Psych and Psych Services; Ms. Campbell documented extreme anxiety, post-traumatic stress disorder, and mild cognitive impairment. (Tr. 430). Plaintiff saw Ms. Campbell four more times over the next month. (Tr. 432-35).

Dr. Pedro documented anxiety symptoms and diagnosed generalized anxiety disorder on six occasions in 2017. (Tr. 376, 369, 412, 541, 602, 616). On another occasion, he noted Plaintiff denied anxiety, depression, or concentration difficulties. (Tr. 420). During his physical examination of Plaintiff in February 2017, Dr. Walker documented mild cognitive delay. (Tr. 469). Plaintiff also saw Ms. Campbell four more times in 2017; Plaintiff was anxious and experiencing short-term memory issues and anxiety in social and work settings. (Tr. 424-28). Ms. Campbell wrote Plaintiff would likely not react well to work settings. (Tr. 428). In September, Dr. Pedro noted Xanax improved Plaintiff's anxiety. (Tr. 598).

Plaintiff's anxiety was documented by Dr. Pedro twice more in 2018: in January, it was gradually improving, and in April, she was experiencing panic attacks, particularly associated with

heights. (Tr. 655, 787). Plaintiff returned to Psych and Psych Services in April 2018 with complaints of "deep depression," inability to sleep, sadness, loss of interest, racing thoughts, panic attacks, minimal energy, and distrust of others. (Tr. 728).

At an appointment in May 2018, Ms. Fish noted Plaintiff's jaw tremor might be exacerbated by anxiety. (Tr. 566). Plaintiff participated in therapy sessions in May and June for ongoing anxiety and post-traumatic stress disorder. (Tr. 732-37). At each visit, Plaintiff's condition was marked as the "same", rather than worsening or improving. *Id.*

Mental Opinion Evidence

Cognitive psychologist Ronald G. Smith, Ph.D., examined Plaintiff on February 24, 2017. (Tr. 459). Dr. Smith diagnosed borderline intellectual functioning, acute stress disorder, and moderate persistent depressive disorder with pure dysthymic syndrome. (Tr. 464). Dr. Smith attested Plaintiff would be able to understand job instructions, but such instructions would be best presented verbally with visual demonstration due to her difficulty with reading comprehension. *Id.* "If she understands a simple task she should be able to remember it, but her ability to successfully carry it out may be compromised at times due to periods of depression and tearfulness", Dr. Smith wrote. *Id.* He opined Plaintiff "may have some difficulty maintaining adequate attention and concentration and persistence in the performance of simple or more complex tasks due to the possible outbreak of emotional episodes." *Id.* Dr. Smith opined Plaintiff should be able to respond appropriately to coworkers and supervisors in a job setting, but she might have some difficulty appropriately dealing with work pressures. (Tr. 465).

State agency physician Vicki Warren, Ph.D., reviewed Plaintiff's records and provided an assessment of mental residual functional capacity in March 2017. (Tr. 90). Dr. Warren opined Plaintiff would be limited to simple and routine tasks due to depression and anxiety. (Tr. 89). Dr.

11

Warren attested Plaintiff was moderately limited in her abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday or workweek without interruptions, perform at a consistent pace without unreasonable rest periods, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and to set realistic goals or make plans independently of others. (Tr. 89–90). Dr. Warren opined Plaintiff would not be able to meet strict production quotas. (Tr. 90).

On June 14, 2017, State agency physician Paul Tangeman, Ph.D., reviewed Plaintiff's records and also provided an assessment of mental residual functional capacity. (Tr. 106). He offered the same limitations as Dr. Warren. (Tr. 105-06).

<u>VE Testimony</u>

A vocational expert testified at the hearing before the ALJ. (Tr. 70-75). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. (Tr. 71-72). The VE testified such an individual would be unable to perform Plaintiff's past work, but could perform sedentary, unskilled work that could mainly be performed with one hand; he provided examples. (Tr. 72-73). Adding a limitation to no interaction with the public did not change the availability of the identified jobs (Tr. 75); adding a limitation that instructions must be given verbally eliminated two of the three identified jobs (Tr. 76). The VE further attested that adding two unscheduled half-hour breaks per day, or three absences per month, or being off-task 20 percent of the time would each be work-preclusive limitations. (Tr. 73-74).

ALJ Decision

In a written decision dated September 18, 2018, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2020 and had not engaged in substantial gainful activity since her alleged onset date (February 25, 2016). (Tr. 18). She found Plaintiff had severe impairments of degenerative disc disease, Erb's palsy, peripheral neuropathy, migraine headaches, obesity, left shoulder tendonitis/impingement, carpal tunnel syndrome, borderline intellectual functioning, generalized anxiety disorder/posttraumatic stress disorder, and persistent depressive disorder. *Id.* The ALJ concluded, however, that these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. *Id.* The ALJ then set forth Plaintiff's RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CRF 404.1567(a) and 416.967(a), except she is able to occasionally lift and carry 15 pounds and frequently lift and carry 10 pounds, is able to stand and walk 6 hours of an 8-hour workday, is able to sit for 6 hours of an 8-hour workday; occasional right hand controls; occasionally climb ramps and stairs, never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasional right handling and fingering; no overhead lifting with the right upper extremity; frequent handling and fingering with the left upper extremity and occasional overhead reaching with the left upper extremity; avoid all exposure to hazards – no working at unprotected heights or around unprotected moving machinery; no commercial driving; can perform simple, routine tasks (unskilled work) with no fast pace or high production quotas; can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility.

(Tr. 21).

The ALJ found Plaintiff was unable to perform any past relevant work (Tr. 32); however, considering Plaintiff's age, education, work experience, and RFC, she could perform jobs that existed in significant numbers in the national economy (Tr. 33). Thus, the ALJ found Plaintiff not disabled from February 25, 2016 (the alleged onset date) through the date of the decision. (Tr. 34).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

14

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Weighing of Opinion Evidence

Plaintiff contends the ALJ failed to properly weigh the opinion evidence from treating physician Dr. Pedro, certified physician assistant Ms. Fish, and consultative psychologist Dr. Smith. For the reasons discussed below, the Court finds no error and affirms.

*Dr. Pedro*

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. A treating physician's opinion is given "controlling

15

weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, she is not required to complete an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

A lack of any physical findings supporting a doctor's diagnosis or opinion is a "good reason" for not giving a treating physician controlling weight, as is a lack of detailed, clinical, diagnostic evidence for a diagnosis or opinion in a doctor's own notes. *See Walters*, 127 F.3d at 530. The specificity with which "good reasons" are articulated must also go beyond the ALJ

invoking the criteria set forth in the regulations; "there must be some effort to identify the specific discrepancies and explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010).

The ALJ assigned Dr. Pedro's opinion "some, but not great or controlling weight," explaining:

> [I]n this case, Dr. Pedro's opinion is not entitled to controlling weight, as it is entirely inconsistent with his own treatment notes, which contain examination findings of obesity and occasional right upper extremity weakness, but full left upper extremity strength, normal breathing, otherwise normal extremities, with no joint tenderness, swelling, or deformity, normal pulses and reflexes, no edema, negative Romberg testing, and normal gait and station. (Exhibit 2F, 3F, 4F, 11F, 13F, 17F). The undersigned gives this opinion some, rather than great weight, because although it was based on a lengthy treating primary care relationship, it is generally inconsistent with the remaining evidence of record, which indicates chronic low back pain, mildly decreased lumbar and cervical range of motion, decreased sensation, persistent right upper extremity dysfunction, obesity, and recent left shoulder pain, but full lower extremity strength, otherwise normal reflexes, normal coordination and station, and a generally normal gait with consistently independent ambulation, which confirms sufficient residual functional capacity to perform work at the sedentary exertional level (Exhibit 1F, 2F, 3F, 4F, 7F, 8F, 10F, 11F, 12F, 13F, 15F, 16F, 17F, 18F, 19F, 21F).

(Tr. 30).

For inconsistencies with Dr. Pedro's own treatment notes, the ALJ cited Exhibits 2F, 3F, 4F, 13F, and 17F in their entirety. *Id.* This amounts to a total of 244 pages, without specifying the contradictions between Dr. Pedro's opinion and his treatment notes. Exhibit 17F alone is 104 pages long. *See* Tr. 592-695. At first glance, this appears to come dangerously close to doing what *Friend* specifically said was prohibited – "dismiss[ing] a treating physician's opinion as 'incompatible' with other evidence of record[.]". 375 F. App'x at 552. However, the ALJ here went further and listed the contrary evidence she referenced in Dr. Pedro's notes: "examination findings of obesity and occasional right upper extremity weakness, but full left upper extremity strength, normal breathing, otherwise normal extremities, with no joint tenderness, swelling, or deformity, normal

pulses and reflexes, no edema, negative Romberg testing, and normal gait and station." (Tr. 30). This is an accurate description of Dr. Pedro's examination findings and, moreover, earlier in her opinion, the ALJ described many of Plaintiff's visits to Dr. Pedro – at which these findings were noted – in greater detail. *See* Tr. 23; Tr. 306-07 (February 2016 – right upper extremity weakness, but full left upper extremity strength, no acute distress, normal heart, lungs, and abdomen, normal extremities, without joint tenderness, deformity, or swelling, normal deep tendon reflexes, gait, and station, and negative Romberg testing); Tr. 393 (November 2016 – no abnormalities on examination except dermatitis); Tr. 376, 415, 420-21, 544-45, 600 (January, March, May, June, and September 2017 examinations noting no abnormalities). Two of these notes also indicated, on review of systems, that Plaintiff was "negative for . . . gait disturbance." (Tr. 415, 599).

The Sixth Circuit has recognized that remand is not required when "it is clear which evidence [the ALJ] was referring to" as inconsistent. *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016); *see also Murphy v. Comm'r of Soc. Sec.*, 2019 WL 6463392, at *1 (N.D. Ohio) (finding an ALJ's decision to discount an opinion as not "consistent with the medical evidence of record, which supports generally mild findings" sufficient where it was "clear from [his earlier] discussion which mild findings the ALJ was referring to").

Second, the ALJ, for inconsistencies with the remaining evidence in the record, cited Exhibits 1F, 2F, 3F, 4F, 7F, 8F, 10F, 11F, 12F, 13F, 15F, 16F, 17F, 18F, 19F, and 21F. (Tr. 30). This amounts to 424 pages cited in their entirety for contradictions between Dr. Pedro's opinions and "the remaining evidence of record." *Id.* Again, at first glance, this appears non-specific. But once again, on the prior pages, the ALJ more thoroughly detailed the other evidence of record (*see* Tr. 23-25) and accurately summarizes that evidence as showing "chronic low back pain, mildly decreased lumbar and cervical range of motion, decreased sensation, persistent right upper

18

extremity dysfunction, obesity, and recent left shoulder pain, but full lower extremity strength, otherwise normal reflexes, normal coordination and station, and a generally normal gait with consistently independent ambulation" (Tr. 30). In that earlier discussion of the medical evidence, the ALJ described, *inter alia*: (1) Dr. Mahajan's December 2016 examination which showed mild scoliosis, right extremity problems, decreased lower extremity sensation, but normal left upper extremity and bilateral lower extremity strength and deep tendon reflexes, normal coordination and gait, and negative Romberg testing (Tr. 440-41); (2) Dr. Walker's February 2017 consultative examination which showed full left upper extremity and bilateral lower extremity strength, normal lower extremity reflexes, intact sensation except in the right upper extremity, and a normal gait (Tr. 468-69); (3) Dr. Choi's June 2017 examination which revealed a decreased range of motion and strength in the right shoulder, decreased range of motion in the lumbar spine with pain, and positive facet joint provocative maneuver, but normal straight leg raising and deep tendon reflexes. (Tr. 706, 709, 712); and (4) Dr. Bej's and Ms. Fish's examination notes showing reduced right upper extremity strength and reflexes, abnormal tandem gait, moderate to severe spinal muscle spasms, but also normal extremities without edema, normal coordination and sensation, normal arm swing, and otherwise normal gait and station (Tr. 530-31, 566-69, 573-75, 580-82).[2] *See* Tr. 24-25.

Plaintiff tacitly acknowledges the supportability problem, noting "Dr. Pedro did a poor job of documenting physical examination findings and in notes . . ." (Doc. 15, at 20). She argues, however, that "the identified conditions cited as support for each limitation in his opinion are

---

2. As the Commissioner points out, Dr. Bej noted contradictory findings within his August 2017 record. In one place, she states Plaintiff's tandem gait is "off, unclear why" (Tr. 530), but on the next page he indicates Plaintiff's "station and gait are normal" with "[t]oe, heel, and tandem gait walking . . performed without difficulty" (Tr. 531).

consistent with the findings and limitations of the specialists in this case and suggest that he was also privy to their records." *Id.* That is, she does not argue that the ALJ misrepresented Dr. Pedro's findings, but contends other evidence supports his opinion. But this Court does not resolve conflicts in the evidence, *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). and must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ", *Jones*, 336 F.3d at 477.

Dr. Pedro's opinion differs from the RFC in several ways – first, he concluded Plaintiff could only stand or walk for two hours of an eight-hour workday and the RFC said six; second, he concluded Plaintiff could only sit for two hours of an eight-hour workday and the RFC said six; third, he concluded Plaintiff could rarely perform fine manipulation and occasionally perform gross manipulation (without distinguishing between left and right), the ALJ said occasional handling and fingering on the right hand, and frequent on the left; and fourth, Dr. Pedro opined Plaintiff would require an additional four hours of rest during an eight-hour workday.. *Compare* Tr. 30 *with* Tr. 549-50. The objective examination findings cited by the ALJ in addressing both the supportability and consistency of Dr. Pedro's opinion speaks to these differences and her reasons for discounting that opinion. As such, the Court finds no error.

Although it might have been preferable for the ALJ to list specific records in her analysis of the opinion, the Court is mindful that "judicial review does not contemplate a quest for administrative perfection." *Hill v. Astrue*, 2013 WL 3293657, at *4 (W.D. Ky.) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)). The ALJ's decision, read in its entirety, supports the ALJ's analysis of Dr. Pedro's opinion as unsupported by his own treatment notes and inconsistent with the record as a whole. These are good reasons, that is, reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *4.

*Ms. Fish*

Plaintiff further argues the ALJ improperly discounted Ms. Fish's opinion. Ms. Fish is an "other source" under the regulations. *See* 20 C.F.R. §§ 404.1527, 416.927. Her opinion is to be considered with the same factors as a treating physician, and the ALJ "generally should explain the weight given" such an opinion "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning" 20 C.F.R. §§ 404.1527(f)(1) & (2), 416.927(f)(1) & (2), even though her opinion is generally entitled to less weight than an acceptable medical source's opinion, *Meuzelaar v. Comm'r of Soc. Sec.*, 648 F. App'x 582, 585 (6th Cir. 2016). As an "other source" and non-treating physician, the reasons-giving requirement does not apply to her opinion. *See, e.g.*, *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014).

The ALJ described her rationale for giving Ms. Fish's opinion "less weight":

This opinion warrants less weight, because although Ms. Fish is a treating source, she is not an acceptable medical source as defined by the Social Security Administration regulations (20 CFR 404.1527 and 416.927). Furthermore, the opinion is inconsistent with the medical record as a whole, including the evidence of full left upper extremity and lower extremity strength, normal coordination, normal respiratory functioning, and a generally normal gait with independent ambulation, which confirms the claimant is less limited than set forth by Ms. Fish (Exhibit 1F, 2F, 3F, 4F, 7F, 8F, 10F, 11F, 12F, 13F, 15F, 16F, 17F, 18F, 19F, 21F).

(Tr. 31).

As above with Dr. Pedro, the ALJ cited a lengthy portion of the record for discounting Ms. Fish's opinion as "inconsistent with the record as a whole." *Id.* But similar to Dr. Pedro, the ALJ cited contrary findings in the record, which she discussed earlier in her opinion. And the relatively mild findings cited by the ALJ are reasonably read to contradict Ms. Fish's more extreme opinion that Plaintiff could, *inter alia*, only lift five pounds (without distinguishing between the right and

21

left sides), stand and walk for 30 to 60 minutes, and occasionally reach, push, pull, or manipulate with her left hand. *See* Tr. 564-65. The undersigned finds the ALJ's explanation sufficiently explains the weight assigned and her reasoning. 20 C.F.R. §§ 404.1527(f)(1) & (2), 416.927(f)(1) & (2).

   *Dr. Smith*

   Third, Plaintiff contends the ALJ's evaluation of Dr. Smith's opinion is unsupported. Dr. Smith is an examining, but not treating physician. As such, his opinion must be considered with the same factors as a treating physician. Although the requirement to provide "good reasons" does not apply to such opinions, "the ALJ's decision still must say enough to allow the appellate court to trace the path of [her] reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 520 (6th Cir. 2011) (quoting *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)).

   The ALJ described her rationale for giving Dr. Smith's opinion "some weight":

   > This opinion warrants some weight, as it was informed by program knowledge and is supported by the claimant's reported symptoms and Dr. Smith's own consultative examination findings of limited reading and math skills, poor performance on digit span, and slightly abnormal speech. (*Id.*). However, the behavioral record as a whole, including the claimant's reported symptoms and evidence of persistent mood and affect abnormalities, decreased cognitive functioning, and occasional tangentially [sic] on examination, but normal alertness and orientation, cooperative behavior, normal thoughts, intact insight and judgment, and ability to relate well to others, confirms the claimant is less limited (Exhibit 1F, 2F, 3F, 4F, 6F, 7F, 8F[,] 9F, 11F, 12F, 13F, 16F, 17F, 20F). Thus, the opinion warrants some, but not great weight.

*Id.*

   As with Dr. Pedro and Ms. Fish, the ALJ was less-than-specific in her record citations, but specific in describing the findings she found inconsistent with Dr. Smith's functional opinion. And, again, earlier in her opinion, she described Dr. Smith's examination – and the other mental health evidence – in greater detail. *See* Tr. 26. For example, in that earlier analysis, the ALJ accurately

cited Ms. Campbell's mental status examinations from December 2016 to January 2017 showing "occasional tangentiality and a depressed, anxious mood and affect, and . . . overwhelmed coping", but also Plaintiff "was alert and oriented, with good awareness, moderate to good judgment, and normal thoughts." *Id.*; *see* Tr. 430-35. The ALJ also summarized Plaintiff's further psychiatric treatment with mental status examinations showing "an anxious mood and overwhelmed coping", but that she was "alert and oriented, with good awareness, moderate to good judgment, [and] normal thoughts." (Tr. 26); *see* Tr. 732-38; *see also* Tr. 20-21 (evaluating the effect of Plaintiff's mental impairments at Step Two). Moreover, the ALJ summarized the less restrictive opinions of both the State agency reviewing physicians, and Ms. Campbell (Tr. 31-32), giving each some weight. (Tr. 31-32); *see also* Tr. 89-90, 105-06 (state agency physician opinions); Tr. 424-47 (Ms. Campbell).

As with the other opinion evidence, the undersigned finds the ALJ's evaluation of Dr. Smith's opinion supported by substantial evidence. The decision "say[s] enough to allow the appellate court to trace the path of [her] reasoning" as to this opinion. *Stacey*, 451 F. App'x at 520 (quoting *Diaz*, 55 F.3d at 307). The ALJ included significant mental restrictions in the RFC. *See* Tr. 21 ("can perform simple, routine tasks (unskilled work) with no fast pace or high production quotas; can perform low stress work meaning no arbitration, negotiation, responsibility for the safety of others, or supervisory responsibility."). That is, the ALJ found Plaintiff limited, just not to the same degree as Dr. Smith opined.[3]

---

3. Plaintiff objects to the ALJ's discounting of both Dr. Smith's opinion and the state agency physician opinions. (Doc. 23-24). But although the RFC must be supported by substantial evidence, the RFC itself is the province of the ALJ, it need not correspond to, or even be based on, any specific medical opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015). It is the ALJ's duty to formulate a claimant's RFC based on all the relevant, credible evidence of record. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013). The ALJ did so here.

RFC / Subjective Symptoms

Plaintiff also argues the ALJ erred in concluding Plaintiff retained the RFC for full time work by misstating the extent of her daily activities, misrepresenting her treatment, and suggesting nonprescribed alternative treatments. (Doc. 15, at 25). The Court finds no error on this basis.

A plaintiff's RFC is "the most a claimant can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009) (interpreting 20 C.F.R. §§ 404.1545(a), 416.945(a)). All a claimant's impairments are to be considered in the inquiry, and the RFC is to be based on all relevant medical and other evidence. 20 C.F.R. §§ 404.1545(a), 416.945(a).

In considering symptoms, an ALJ follows a two-step process, prescribed by regulation. An ALJ must first determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's alleged symptoms; second, if such an impairment exists, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms on the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1529(a), 416.929(a). In making this determination and considering whether a claimant has disabling pain, an ALJ must consider: (1) daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, to relieve pain; and (6) any other measures used to relieve pain. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also* SSR 16-3p, 2017 WL 5180304. Although the ALJ must "consider" the listed factors, there is no requirement that she discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v.*

24

*Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that a credibility determination will not be disturbed "absent compelling reason", *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001), and such a determination is "virtually unchallengeable", *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal quotation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]"). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ set forth this two-step process (Tr. 22-23) and concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical evidence and other relevant evidence considered herein." (Tr. 22). Her analysis of Plaintiff's symptoms then occurs throughout the remainder of her opinion. *See* Tr. 23-29. For the reasons discussed below, the undersigned finds Plaintiff has not pointed to any reversible error in the ALJ's analysis.

*Plaintiff's Daily Activities*

Plaintiff first argues the ALJ overstated the extent of Plaintiff's activities of daily living in order to discount Plaintiff's testimony. (Doc. 15, at 26). While daily activities such as taking care of oneself, household tasks, hobbies, or social activities are not considered substantial gainful activity, such activities are related to a plaintiff's symptoms and may be evaluated as such. 20

25

C.F.R. §§ 404.1572(c), 404.1529(c)(3)(i), 416.972(c), 416.929(c)(3)(i). An ALJ acts properly when taking such activities into account when evaluating a Plaintiff's assertion of her ailments. *Walters*, 127 F.3d at 532.

Plaintiff contends primarily that the ALJ "cherry-picked" the evidence. (Doc. 15, at 29). Plaintiff is correct that the Court will reverse where the ALJ parses select portions of the record. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec*, 741 F.3d 708, 723-24 (6th Cir. 2014). But ALJs are not required "to discuss each piece of data in [their] opinion[s], so long as they consider the evidence as a whole and reach a reasoned conclusion." *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010). Moreover, such "cherry picking" arguments are often equally well described as the ALJ weighing the evidence. *White*, 572 F.3d at 284.

That is precisely the case here. Plaintiff argues the ALJ noted Plaintiff's abilities to perform various tasks of daily living but failed to note her limitations in those abilities. (Doc. 15, at 28). The ALJ opinion, however, acknowledges Plaintiff's limitations and need for assistance in leaving the house, performing various chores, driving, and grocery shopping, concluding after noting these limitations that "the claimant's medically determinable impairments could reasonably be expected to produce the above symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the objective medical evidence and other relevant evidence therein." (Tr. 22). On the next pages of the opinion, the ALJ lists specific portions of the record that do not fully corroborate Plaintiff's claims. (Tr. 23); *see also* Tr. 28 (describing Plaintiff's daily activities). This is a reasonable assessment of the evidence on the whole, and it contains an adequate discussion of the limitations in Plaintiff's ability to perform activities of daily living. As in *Smith v. Commissioner of Social Security*, "[t]he ALJ did not conclude that Plaintiff could work because she could perform basic daily activities; instead,

he reasonably concluded that Plaintiff's allegations of disabling symptoms and limitations were inconsistent with her activities of daily living." 2017 WL 427359, at *11 (S.D. Ohio).

*Conservative Treatment*

Second, Plaintiff challenges the ALJ's description of her course of treatment as "relatively conservative." A history of conservative medical treatment can be considered in a decision to discount allegations of total disability. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 638-39 (6th Cir. 2016). Treatment is "relatively conservative" when, for example, it remains largely the same even as symptoms change or worsen, and no hospitalization or surgical intervention is required. *See Simmons v. Colvin*, 2014 WL 977756, at *13 (N.D. Ohio); *Pinson v. Comm'r of Soc. Sec.*, 2019 WL 969484, at *9 (N.D. Ohio).

Although the ALJ again cited broad swaths of the record in support of her statement that Plaintiff's treatment was conservative, she also accurately and specifically described both the extent of Plaintiff's treatment – that it consisted of "physical therapy, occasional lumbar facet joint injections, and medications prescribed by the claimant's various providers" – and, further, what Plaintiff's treatment did not include – an assistive device with ambulation, hospitalization, or inpatient medical treatment. (Tr. 28-29). The Court concludes that substantial evidence supports the ALJ's characterization of Plaintiff's treatment as "relatively conservative."

*Suggestions of Alternative Treatments*

Finally, Plaintiff argues the ALJ erred by discrediting Plaintiff's allegations "for lack of treatment that was never prescribed or recommended." (Doc. 15, at 26). Plaintiff is correct that decisions beyond the expertise of the ALJ – such as medical decisions – are not a legitimate basis for determination of adverse credibility. *Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006). But the responsibility for determining RFC rests with the ALJ, not the physicians who have treated

the plaintiff nor the plaintiff herself, and "an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe*, 342 F. App'x at 157. By listing less-conservative measures than those taken by Plaintiff – despite the slight error regarding Plaintiff's use of a TENS unit – the Court concludes the ALJ did not play doctor. (Tr. 28). As such, the Court declines to find error on this basis.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision supported by substantial evidence and affirms that decision.


  s/ James R. Knepp II
United States Magistrate Judge